TRUDY A. BLATCHLEY ET AL. *v.* ABRAHAM
MINTZ ET AL.
(AC 23461)

Bishop, DiPentima and Mihalakos, Js.

Argued October 29, 2003—officially released March 9, 2004

*John D. Josel*, for the appellant (named plaintiff).

*Charles W. Fleischmann*, for the appellees (defendant Jeffrey L. Gross et al.).

*Frank H. Santoro*, with whom, on the brief, were *Paul T. Edwards* and *Joyce A. Lagnese*, for the appellee (defendant George L. Van der Aue).

*Opinion*

BISHOP, J. This appeal is brought by a woman who was rendered partially paralyzed as a result of brain surgery. The underlying issues are whether the trial court, in instructing the jury, improperly restricted and mischaracterized the claims to be submitted to the jury for adjudication. For the reasons set forth, we affirm in part and reverse in part the judgment of the trial court.

The jury could reasonably have found the following facts relevant to our discussion of this appeal. In December, 1994, the plaintiff, Trudy A. Blatchley,[1] was taken to a hospital after she awoke with a feeling of numbness and tingling on her left side. While hospitalized, the plaintiff was under the care of a neurologist, Daniel Alkaitis, a partner of a fellow neurologist, the defendant Jeffrey L. Gross. Various examinations and tests revealed that the plaintiff had a small abnormality

---

[1] Michael Blatchley was named as a plaintiff but is not involved in this appeal. We refer in this opinion to Trudy Blatchley as the plaintiff.

in her brain, which was interpreted as consistent with, inter alia, multiple sclerosis, a demyelinating disease.

Alkaitis arranged for the plaintiff to undergo more tests, the results of which were interpreted by Gross. According to the plaintiff, Gross discussed the plaintiff's condition with his partners and was aware of her condition. The plaintiff continued to undergo testing and in late January, 1995, the abnormality that previously had been detected had doubled in size.

The plaintiff was informed that Gross wanted her to see a neurosurgeon, as he believed she had a brain tumor. The plaintiff alleged that a neurosurgeon, Abraham Mintz, was told by Gross that the plaintiff needed surgery for a rapidly expanding brain lesion. The plaintiff further claimed that Gross told Mintz that the plaintiff had received a thorough workup and that tests had been done to rule out infection and multiple sclerosis.

On February 10, 1995, Mintz undertook a diagnostic biopsy of the tissue of the mass, which was sent to the hospital's pathology department for immediate analysis while the plaintiff remained sedated in the operating room. Pathologist George L. Van der Aue, also a defendant, examined the biopsied tissue. The plaintiff alleged that following that examination, Van der Aue communicated to Mintz that the plaintiff's biopsied specimen showed a tumor and that, on the basis of that communication, Mintz decided to undertake further surgery to remove the mass. Following the surgery, the plaintiff awoke paralyzed and without sensation in the left side of her body. The biopsy specimens ultimately revealed that the tissue removed from the brain was not cancerous but, instead, merely showed demyelination.

In May, 1997, the plaintiff brought a negligence action alleging medical malpractice against, among others, Gross and Van der Aue.[2] After a trial, the jury returned

---

[2] Also named as defendants were Associated Neurologists of Southern Connecticut, P.C.; George L. Van der Aue, M.D., P.C.; Fairfield County Pathol-

a verdict in favor of the defendants. In posttrial motions, the plaintiff asked the court to set the verdict aside and to order a new trial. The court accepted the jury's verdict, denied the plaintiff's motion to set aside the verdict and for a new trial, and rendered judgment for the defendants, from which the plaintiff has appealed.

On appeal, the plaintiff challenges the court's instructions to the jury, claiming that the court improperly (1) restricted her claims against Gross[3] and (2) mischaracterized her claim against Van der Aue.[4] We address each of those claims in turn. Additional facts will be set forth where necessary.

I

We first turn to the plaintiff's disagreement with the court's instructions to the jury with respect to her

ogy Consultants; Fairfield County Pathology Consultants, P.C.; and St. Vincent's Medical Center. The plaintiff alleged that Associated Neurologists of Southern Connecticut, P.C., was vicariously liable for her injuries because Gross was acting within the scope of his employment in making the referral to Mintz. Similarly, the plaintiff alleged that George L. Van der Aue, M.D., P.C., Fairfield County Pathology Consultants, Fairfield County Pathology Consultants, P.C., and St. Vincent's Medical Center were vicariously liable for her injuries because Van der Aue was acting within the scope of his employment in communicating his interpretation of the plaintiff's biopsy specimens. Vicarious liability, however, is not an issue in this appeal. We therefore refer only to Gross and to Van der Aue as the defendants throughout this opinion.

We further note that, in addition to the aforementioned parties, this action was also brought against other individuals and entities. Before trial, however, a settlement was reached with those parties, and the case against them was withdrawn.

[3] We also acknowledge that, at oral argument, it appeared that counsel for the plaintiff raised for the first time to this court an additional claim that the trial court's charge regarding that claim also was improper. We decline to address that claim, however, on the basis of the well established rule, that this court does not have to entertain claims that are raised for the first time at oral argument and, thus, are inadequately briefed.

[4] The plaintiff raises additional claims on appeal with respect to Van der Aue; however, we need not address them inasmuch as our holding with respect to the court's improper jury instructions is dispositive.

claims against Gross.[5] We begin our analysis by noting that we will reverse a judgment because of an improper jury instruction only if it can be shown that it is reasonably probable that the jury was misled. *Sevigny* v. *Dibble Hollow Condominium Assn., Inc.*, 76 Conn. App. 306, 311, 819 A.2d 844 (2003). To make that determination, we consider whether such instructions were correct in the law, adapted to the issues in the case and provided sufficient guidance to the jury. Id., 311–12. Simply put, the test to be applied is whether the instruction, considered as a whole, presents the case to the jury so that no injustice will result. Id.

In the present case, as part of its instruction concerning the plaintiff's negligence claim against Gross, the court instructed the jury as follows:

"I've described what the claim in this case is of malpractice against Dr. Gross, and I've described it in a certain way. What I am going to describe that claim as, because I believe this is, in fact, what the claim is in this case, and it is the claim that you will be deciding, is that Dr. Gross told Dr. Mintz that the plaintiff had been worked up for multiple sclerosis, but that multiple

---

[5] The first count of the plaintiff's operative complaint set forth the following claims against Gross:

"18: Defendant Gross did not examine plaintiff prior to referring plaintiff to [Mintz] but called [Mintz] and informed him that he was referring the plaintiff for neurosurgery, that she had an expanding mass lesion, and that a thorough neurologic workup had been conducted and that multiple sclerosis (a demyelinating disease) had been ruled out. . . .

"37: Plaintiff's injuries and deficits were caused by the negligence of the defendant Gross, for whose negligence defendant [Associated Neurologists of Southern Connecticut, P.C.] is responsible, in one or more of the following respects:

"a. in that he failed to treat properly the plaintiff;

"b. in that he failed to diagnose properly the plaintiff's medical condition;

"c. in that he failed to provide proper neurologic and medical treatment to the plaintiff;

"e. in that he improperly referred the plaintiff for neurosurgery;

"f. in that he failed to exercise that degree of care, skill, and/or diligence ordinarily employed by neurologists under similar circumstances as set forth in this Complaint."

sclerosis had been ruled out, meaning that the plaintiff definitely did not have multiple sclerosis or demyelinating disease. That is the claim in this case that you may consider . . . ."

The plaintiff argues that that instruction improperly eliminated from the jury's consideration valid and supported claims of negligence against Gross that had been pleaded and upon which requests to charge had been submitted.[6] We are not persuaded.

There can be no dispute that it is the duty of the trial court to state to the jury the claims presented to it for adjudication. See *Dimeo* v. *Burns, Brooks & McNeil, Inc.*, 6 Conn. App. 241, 245, 504 A.2d 557 (court has obligation to frame instructions so as to be adapted only to issues in case), cert. denied, 199 Conn. 805, 508 A.2d 31 (1986). The record reflects, however, as we will discuss, that the claims that the plaintiff argues were improperly eliminated were not issues in the trial of the case, as the plaintiff implicitly waived her right to have the jury consider those claims. Accordingly, we conclude that the court properly tailored its instructions

[6] At trial, the plaintiff made the following relevant written requests to charge, which were refused by the court:

"14: It is the plaintiff's position that Gross also spoke with Dr. Mintz and referred [the plaintiff] to Dr. Mintz for surgery. The plaintiff claims that pursuant to Gross' duty, this referral should only have been made if Gross clearly communicated to Dr. Mintz that [multiple sclerosis] or demyelinating disease was still a potential cause of the plaintiff's condition and that stating that [multiple sclerosis] had been ruled out constituted a deviation from the standard of care. . . .

"27: In the complaint, the plaintiff sets forth the specific ways in which she contends Dr. Gross was negligent. The plaintiff contends that Dr. Gross was negligent:

"a. in that he failed to treat properly the plaintiff;

"b. in that he failed to diagnose properly the plaintiff's medical condition;

"c. in that he failed to provide proper neurologic and medical treatment to the plaintiff;

"e. in that he improperly referred the plaintiff for neurosurgery;

"f. in that he failed to exercise that degree of care, skill, and/or diligence *ordinarily employed by neurologists under similar circumstances as set forth in this Complaint.*"

to reflect the issues actually before the jury. As such, we cannot conclude that the jury was misled by the court's instructions. See *Harlan* v. *Norwalk Anesthesiology, P.C.*, 75 Conn. App. 600, 607, 816 A.2d 719 ("[i]nstructions that are correct as a matter of law cannot be characterized as misleading"), cert. denied, 264 Conn. 911, 826 A.2d 1155 (2003).

Our conclusion rests on the exchange that occurred in open court when the plaintiff sought to amend her complaint. The record discloses that at the end of her case-in-chief, the plaintiff filed a request to amend her complaint in accordance with the evidence adduced at trial. When Gross objected to that amendment, the following exchange, in relevant part, occurred:

"[The Plaintiff's Counsel]: The changes are merely to reflect what has been proven at trial and . . . the court should allow those variances between the pleadings as they existed and the proof at trial through an amended complaint. There's no . . . change in the theory of recovery. It's merely—it's a refinement based on the testimony . . . .

"The Court: Just to clarify for me, if you would, please, with respect to paragraph thirty-seven.[7] Which subparagraph of thirty-seven do you claim applies to the testimony of this case? You have made it real clear, it seems to me, that the only theory of liability upon which you're pursuing Dr. Gross is the communication to . . . Dr. Mintz that [multiple sclerosis] had been ruled out. That's . . . the only one, correct?

"[The Plaintiff's Counsel]: That's—that's the referral. Dr. Mintz testified that [the plaintiff] . . . was being referred by the neurosurgeon, Dr. Gross, and as part of that referral, he was told that [multiple sclerosis] had been ruled out.

---

[7] See footnote 5.

"The Court: But the way you've put this, you've put it in a way that's far broader than what I think you've got. I mean, you've pointed—and I think accurately—to what [defense counsel's] questioning did by way of bringing out a theory that was supportable through the testimony of a board certified neurologist. . . . But that's a very narrow theory. . . . So, looking at this, seeing it written large like this, my question really is, why write it so large when, in fact, really, the only thing that could go in under it is what we've just talked about? If I read the language in that way as being that broad . . . it could, as written, go to the very decision to refer to neurosurgery at all. . . .

"[The Plaintiff's Counsel]: We've—and *I've made it very clear to the court and to counsel that what we're proceeding on is Dr. Gross' statement during the referral that [multiple sclerosis] had been ruled out.*

"The Court: So that, in fact, the practical fact is that with respect to Dr. Gross, apart from the changes to paragraphs, I guess you said sixteen to eighteen,[8] which are more specific and—

"[The Plaintiff's Counsel]: There's eighteen through twenty-one.

"The Court: Oh, I'm sorry. Eighteen is the one in particular, though, is it not, that talks about the—

"[The Plaintiff's Counsel]: The referral.

"The Court: Right, the referral. That's the one that refers to the referral.

"[The Plaintiff's Counsel]: Right.

"The Court: That—that whether that is referenced by your paragraph [37, subparagraph (f)], which it could be, I suppose, or by your paragraph [37, subparagraph

---

[8] See footnote 5.

(e)], that it doesn't change what you've represented to me on the record or to all of us on the record as to the basis, and the sole basis, on which you'd be pursuing Dr. Gross?

"[The Plaintiff's Counsel]: Right.

"The Court: Okay, [to defendant Gross' counsel] that is a clarification and a substantial narrowing of language. I have never been under the notion that they were trying anything else. I think they've been real clear over the last days that's what they're looking to do. . . .

"[The Defendant Gross' Counsel]: Well, if we're understanding it that way, then all of these other allegations should have been taken out of this complaint. If that's all he's going forward on, what he's going forward on should be here.

"The Court: Well, you know, I understand that, except counsel doesn't have the obligation to take out of a complaint all these things. . . . I am going to permit the filing of this complaint. . . . As to Dr. Gross, I agree with [defendant Gross' counsel], it's far broader in this iteration than what the evidence is; however, I think, fairly, in light of the new paragraph eighteen, that either subparagraph (f) or subparagraph (e) [of paragraph thirty-seven] read very narrowly can be understood to mean exactly what [the plaintiff's counsel] has indicated he's pursuing. So, I'm going to allow the amendment with that understanding." (Emphasis added.)

It is clear from that exchange that the court permitted the filing of the plaintiff's amended complaint only with the understanding that the sole issue of liability that the plaintiff was pursuing was Gross' alleged communication to Mintz that multiple sclerosis had been ruled out. Furthermore, by conceding that that was the sole issue of liability she was pursuing, the plaintiff implicitly waived her right to have the jury consider any additional

claims against Gross. Put simply, the plaintiff's representations to the court made clear that her additional claims against Gross were not issues in the case.

As a consequence, we conclude that the court's instructions were tailored to reflect the actual issue before the jury. That issue was whether Gross negligently had told Mintz that the plaintiff had been worked up for multiple sclerosis, but that multiple sclerosis had been ruled out. Whether Gross negligently failed to state affirmatively to Mintz that multiple sclerosis was still a consideration or whether he failed to treat or to diagnose the plaintiff properly were not issues advanced by the plaintiff at trial. For that reason, we conclude that the plaintiff has failed to demonstrate that it is reasonably probable that the court's charge misled the jury. Accordingly, her first claim must fail.

## II

We next consider the plaintiff's attack on the court's instructions to the jury concerning Van der Aue.

We begin our analysis by noting that our review of the plaintiff's claims are governed by the standards previously set forth. We emphasize that "[a] jury charge is to be considered from the standpoint of its effect on the jury in guiding it to a correct verdict. . . . The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Jury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 446, 782 A.2d 87 (2001). Our standard of review for the plaintiff's claim is whether it is reasonably probable that the jury was misled. See *Sevigny*

v. *Dibble Hollow Condominium Assn., Inc.*, supra, 76 Conn. App. 311.

The following additional facts and procedural history are relevant to our discussion of the plaintiff's claims. During the plaintiff's case-in-chief, the plaintiff's counsel called pathologist Daniel Perl to testify as an expert in the field of pathology. Specifically, Perl was called to testify about the standard of care applicable to a board certified pathologist rendering an intraoperative pathologic diagnosis in February, 1995. Perl gave the following relevant testimony concerning the applicable standard of care:

"One needs to make this determination: Is it normal or is it abnormal? One then needs to make the determination, is this tumor or not tumor? If it is tumor, the distinction between a primary tumor of the nervous system and a metastasis needs to be made. Beyond that, in—maybe additional information, but that's where one has to go in terms of standard of care. You have to be able to tell that the tissue is abnormal, that a tumor is present and that it's either primary or a metastasis. The other features, in terms of the cell of origin, the grading . . . in the vast majority of cases, is not an important question as far as he's concerned. He needs to know, I'm dealing with a primary cancer in the brain, now I proceed, or, oh, I'm not dealing with a primary cancer of the brain, I'm dealing with a metastasis, oh, my God, I'm dealing with a completely different problem, or he needs to know, I'm not dealing with a tumor at all, this is not a cancer. Those are things he needs to know. . . . [I]n the operating room . . . in this kind of consultation, that's how far one needs to go."

He further testified that the standard of care required that Van der Aue communicate to the neurosurgeons that a tumor was not present. Perl testified that the words Van der Aue used to convey the results of his

intraoperative consultation to Mintz constituted a definitive communication that the biopsy specimen showed a tumor. That communication, Perl testified, was a deviation of the standard of care.[9]

Thus, a fair reading of the record reveals that Perl stated that Van der Aue had misdiagnosed the biopsy specimen as showing a tumor and that the words used in Van der Aue's communication to the neurosurgeons constituted a definitive communication of that misdiagnosis.

Although not part of the plaintiff's claims, the term "definitive diagnosis of tumor" was used repeatedly by defense counsel throughout the trial. During cross-examination, however, in response to a question from defense counsel in which the term "definitive diagnosis" was used, Perl expressed his concern with counsel's use of that term.

Perl cautioned that use of the term "definitive diagnosis" in the context of this case connoted a diagnosis that would include a description of the cell type and the grade of the malignancy, and that such a detailed analysis would not be the objective of the pathologist when conducting a frozen section diagnosis. He further indicated that, when analyzing a frozen section in this context, the definitive statement that needs to be made intraoperatively is simply that "the biopsy specimen showed tumor or not." He concluded that because Van der Aue's communication to the neurosurgeons was definitive of tumor, Van der Aue had breached the applicable standard of care. It is noteworthy that at no time

---

[9] From the record, it appears that Van der Aue's communication to the neurosurgeons consisted of a written note on which is stated: "Atypical astrocytic process with vascular proliferation, probably astrocytoma, awaiting permanent sections." Additionally, the plaintiff adduced testimony from Mintz that Van der Aue personally appeared in the operating room and told him that the plaintiff's biopsy specimen showed a tumor.

did Perl testify that Van der Aue had rendered a definitive diagnosis of tumor to the neurosurgeons.

Despite that testimony, defense counsel continued to use interchangeably the dissimilar concepts of a definitive communication of the presence of a tumor and a communication of a definitive diagnosis of the tumor. It is the confusion created at trial by counsel's interchangeable use of those different concepts that is central to our analysis of the court's jury instructions. The court gave the following relevant instruction concerning the plaintiff's claim against Van der Aue: "As for Dr. Van der Aue, the plaintiff has alleged and sought to prove that he deviated from the standard of care for board certified pathologists in February of 1995 by communicating a *definitive diagnosis* of tumor to her neurosurgeons on February 10, 1995, based on his intraoperative interpretation of frozen sections of her biopsied brain tissue. In this case, there is no dispute that a board certified pathologist would have deviated from the standard of care by communicating a *definitive diagnosis* of tumor to the plaintiff's neurosurgeons based upon an examination of the frozen sections Dr. Van der Aue examined intraoperatively on February 10, 1995. Dr. Van der Aue insists, however, that he did not violate the standard of care for board certified pathologist in this case because the only diagnosis he ever communicated to the neurosurgeons was not definitive for tumor." (Emphasis added.)

After the jury was instructed, the plaintiff took exception to the charge on the grounds that the court's use of the term "definitive diagnosis" was inappropriate in light of the evidence adduced at trial that "definitive diagnosis" was a term of art in the practice of pathology. She further asserted that the issue presented for adjudication was whether Van der Aue had made a definitive statement to the neurosurgeons that the plaintiff's biopsy specimen showed a tumor, not whether Van

der Aue went further and communicated a definitive diagnosis of that tumor. The court declined to recharge on that issue.

On appeal, the plaintiff asserts that the court's instruction mischaracterized her claim of negligence against Van der Aue and, thus, misled the jury in reaching a proper verdict with respect to that defendant. Specifically, she argues that the court improperly eliminated from the jury's consideration her claim against Van der Aue that he had violated the standard of care by definitively communicating to the neurosurgeons that the plaintiff's biopsy specimen showed a tumor, and, instead, substituted a alternate claim that Van der Aue violated the standard of care by communicating a definitive diagnosis of tumor. As to the latter claim, the plaintiff asserts that she neither pleaded nor offered proof at trial that Van der Aue had made a definitive diagnosis of tumor, as such claim was not a necessary underpinning to a finding that Van der Aue had violated the applicable standard of care. We agree.

The court instructed the jury that "the plaintiff has alleged and sought to prove that [Van der Aue] deviated from the standard of care for board certified pathologists . . . by communicating a definitive diagnosis of tumor to her neurosurgeons . . . ." Our careful review of the record reveals that the court's statement was inaccurate. Although the plaintiff clearly alleged and offered testimony that Van der Aue's communication to the neurosurgeons of a probable astrocytoma was definitive for tumor, i.e., a definite statement that the biopsied section contained a tumor, the plaintiff did not claim that Van der Aue had made a definite diagnosis, as that term was defined during testimony. In fact, as noted, the plaintiff's expert testified that a pathologist would rarely make such a detailed analysis intraoperatively.

At the outset, we note that the plaintiff's pleadings alleged that Van der Aue was negligent in that he "performed an analysis and reported to the surgeon that the [plaintiff's] biopsy specimen showed a tumor; based upon Van der Aue's report of tumor, the neurosurgeon resected the lesion in the plaintiff's brain."

Also, in her closing statement the plaintiff argued in relevant part: "It is a violation of the standard of care, and the communication to the surgeon was wrong. And it was that communication of tumor, however it was said, that it was a tumor without any uncertainty is what led to the surgery going forward from biopsy to resection, and it was that resection that caused my client's damages. . . . He misinterpreted the slides, and he led the surgeons to believe that they were dealing with a tumor."

In her rebuttal to the defendant's closing argument, the plaintiff again posited: "No one is saying that there was a definitive diagnosis. What needs to be done on frozen section is, is it tumor or not a tumor? The definitive diagnosis . . . is not necessary for a frozen section analysis. The question is, was it definitively stated it was a tumor or not, not definitive diagnosis."

Additionally, in her written request to charge, the plaintiff stated in relevant part: "The plaintiff claims that Dr. Van der Aue violated the standard of care in improperly interpreting the frozen section biopsy . . . and in failing to properly communicate to the surgeons that he could not arrive at a diagnosis, and instead diagnosing 'tumor.' " The plaintiff was entitled to that or to a similar charge, as that request properly tracked the evidence.

Finally, the testimony of the plaintiff's expert, Perl, was offered in support of the plaintiff's claim that Van der Aue's definitive communication of tumor to the neurosurgeons violated the standard of care.

Thus, the plaintiff never alleged that Van der Aue deviated from the standard of care by *communicating a definitive diagnosis of tumor* to her neurosurgeons, but, rather, alleged that the standard of care was violated because Van der Aue *definitively stated that the plaintiff's biopsy specimen showed a tumor.* Given the expert testimony offered at trial regarding the additional information that is communicated when rendering a definitive diagnosis of tumor, we conclude that these are two very different claims, the former prescribing as requisite a greater burden of proof than the latter.

In addition to being unsupported by the pleadings, the issue submitted to the jury in the court's charge was unsupported by the evidence as well. The evidence adduced at trial established that a definitive communication by Van der Aue to the neurosurgeons that the plaintiff's biopsy specimen showed a tumor constituted a violation of the standard of care. Nothing in the evidence, however, established that Van der Aue would have to go two steps further and definitively communicate the tumor's cell type and grade of malignancy, as is done when rendering a definitive diagnosis, to deviate from the standard of care.

Thus, in instructing the jury that "the plaintiff has alleged and sought to prove that [Van der Aue] deviated from the standard of care for board certified pathologists . . . *by communicating a definitive diagnosis of tumor* to her neurosurgeons," the court conflated a "definitive communication of tumor" and "definitive diagnosis of tumor." That was inconsistent with the plaintiff's claim in the case and the evidence adduced by the plaintiff in support of that claim.

We therefore conclude that the court's charge improperly submitted to the jury an issue that was supported neither by the pleadings nor the evidence and eliminated from the jury's consideration the plaintiff's

actual claim of negligence against Van der Aue.[10] See *Josephson* v. *Meyers*, 180 Conn. 302, 306, 429 A.2d 877 (1980) (court's duty is to submit to jury only those issues relevant to pleadings and facts in evidence). Because the jury was never given the opportunity to evaluate the proper claim, we further conclude that the court's instructions misled the jury in reaching a proper verdict. Accordingly, the plaintiff is entitled to a new trial.

The judgment is reversed only with respect to Van der Aue and the case is remanded for a new trial as to that defendant only. The judgment court is affirmed in all other respects.

In this opinion the other judges concurred.

---

[10] In addition, the court's instruction presented the case to the jury in such a way that an injustice was done to the plaintiff, given that both the plaintiff and her expert, Perl, indicated at trial that Van der Aue's communication to the neurosurgeons did not constitute a definitive diagnosis, but rather was only a definitive communication of tumor.